Case No. 11-745C
(Judge Charles F. Lettow)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

TRUST TITLE COMPANY,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

DEFENDANT'S POST-TRIAL REPLY BRIEF

STUART F. DELERY
Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

OF COUNSEL:

BRYANT G. SNEE
Deputy Director

MICHAEL N. O'CONNELL
Senior Trial Counsel

ERIC E. LAUFGRABEN
Trial Attorney
Commercial Litigation Branch
Civil Division

TODD P. MAIBERGER
U.S. Department of Housing
and Urban Development
Office of General Counsel
451 7th Street, S.W.
Washington, DC 20410

U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Telephone: (202) 353-7995
Facsimile:  (202) 514-8624

June 4, 2014

Attorneys for Defendant

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................iv

INTRODUCTION ..............................................................................................................1

ARGUMENT ......................................................................................................................2

I.     Trust Title Has Not Proven That Its Defaults Were Excusable ................................3

     A.     Trust Title Cannot Justify Its Failure To Disburse Sales Proceeds In
A Timely Manner ........................................................................................3

          1.     In-House Closings ............................................................................4

          2.     Closings Performed By Third-Party Attorneys .................................4

          3.     Trust Title's Remaining Excuses For Its Repeated Breaches
Of The Contractual Wiring Requirements Are Meritless .................8

               a.     Trust Title Was Not Terminated Because It Did Not
Disburse Sales Proceeds Before Recording ..........................9

               b.     Trust Title's "Humanitarian Efforts" Do Not Excuse Its
Failure To Wire Funds Timely ..............................................10

               c.     Trust Title's Self-Comparison To The O'Brien Law Firm
Is Irrelevant ..........................................................................10

     B.     Trust Title's Cannot Show That Its Failure To Make Progress Was
Excusable ....................................................................................................11

          1.     The Number Of Cases Assigned Does Not Excuse The Backlog
That Accumulated During Trust Title's Performance ......................12

          2.     Trust Title's Expectations Regarding Volume Are Inconsistent
With Its Contracts ...........................................................................13

     C.     Trust Title Fails To Provide Any Meaningful Excuse To Justify Its
Other Breaches Of The Contracts ...............................................................14

          1.     Trust Title Failed To Comply With The Contracts' Personnel
Requirements ...................................................................................14

          2.     Trust Title Failed To Perform 30-Year Title Searches .....................16

3.    Trust Title Failed To Attend Third-Party Closings............................16

4.    Trust Title Failed To Provide Adequate Customer Service...............18

D.    Trust Title's Argument About A "Time Extension" Is A Red Herring.........18

1.    Trust Title Failed To Seek Relief Pursuant To The Contracts For Any Delays..........................................................................................19

2.    Trust Title Fails To Establish Any Nexus Between The Stop Work Order And Its Inability To Close The Cases It Accepted........20

3.    Trust Title's Other Claims Regarding Delays Are Meritless.............21

E.    Trust Title Fails To Demonstrate That It Had The Financial Capacity To Perform The Contracts ...............................................................................23

F.    HUD's Treatment Of Lakeside Title/O'Brien Law Firm Does Not Excuse Trust Title's Breaches Of Its Own Contracts With HUD ................25

1.    Trust Title's Status As A Title Company ...........................................25

2.    HUD Did Not Tolerate Defective Performance By O'Brien.............27

3.    HUD Did Not Treat Trust Title Differently With Respect To Charging For "Extras" ....................................................................28

G.    Trust Title's Remaining Excuses Do Not Justify Its Default .......................29

1.    The Contract Did Not Provide For A Transition Period...................29

2.    Training And The Post Award Conference Do Not Account For Trust Title's Default ...................................................................30

3.    P260 Does Not Justify Trust Title's Default.....................................31

4.    Complaints About HUD / The HMBI Conference Call / Subsequent Performance On The Tax Contract................................32

5.    Default Termination Procedures ......................................................33

II.   The Government Is Entitled To Reprocurement Costs...............................................33

III.   The Cases Trust Title Cites Do Not Support Its Contentions ....................................36

IV.   The Court Should Disregard Exhibits Cited In Trust Title's Brief But Not
        Admitted ....................................................................................................................39

CONCLUSION ....................................................................................................................................40

## TABLE OF AUTHORITIES

### CASES

*Airport Indus. Park v. United States*,
   59 Fed. Cl. 332 (2004) ............................................................................................................ 3

*Am. Ship Bldg. Co. v. United States*,
   654 F.2d 75 (Ct. Cl. 1981) ...................................................................................................... 38

*Darwin Constr. Co., Inc. v. United States*,
   811 F.2d 593 (Fed. Cir. 1987) ................................................................................................ 36

*Farwell Co. v. United States*,
   148 F. Supp. 947 (Ct. Cl. 1957) ................................................................................................ 8

*Grumman Aerospace Corp. v. United States,*,
   497 F.3d 1350 (Fed. Cir. 2007) .............................................................................................. 38

*Helene Curtis Indus., Inc., v. United States*,
   312 F.2d 774 (Ct. Cl. 1963) .................................................................................................... 37

*L.W. Foster Sportswear Co., Inc. v. United States*,
   405 F.2d 1285 (Ct. Cl. 1969) .................................................................................................. 38

*McDonnell Douglas Corp. v. United States*,
   182 F.3d 1319 (Fed. Cir. 1999) .............................................................................................. 36

### REGULATIONS

FAR 52.216-19 .......................................................................................................................... 12

FAR 52.233-3 ............................................................................................................................ 19

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| TRUST TITLE CO., | ) | |
| | ) | No. 11-cv-745 |
| Plaintiff, | ) | (Judge Lettow) |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S POST-TRIAL REPLY BRIEF

Pursuant to the Court's order dated February 6, 2014, defendant respectfully submits this post-trial reply brief.

INTRODUCTION

In our opening brief and at trial, we demonstrated that the contracting officer properly terminated the contracts for default because Trust Title failed to initiate timely wire transfers of sales proceeds to the Government and failed to provide HUD with a plan to alleviate the backlog of closings that had accumulated.  We also demonstrated that there were several other reasons why it was proper for the contracting officer to terminate the contracts, including Trust Title's inability to perform the contracts after it lost employees and vendors who had not been paid, and by failing to staff the contracts adequately even before the employees began to quit.

Trust Title's response to our brief resembles a Jackson Pollock painting: abstract and contrasting, characterized by drips of colorful excuses from which the reader is supposed to divine meaning.  Although creative, the excuses painted by Trust Title do not meaningfully address the breaches underlying Trust Title's default termination.  For instance, Trust Title complains about the volume of cases and a delayed start to the performance period, but fails to explain why it did not exercise the specific contractual remedies available to it under those precise

scenarios.  Trust Title blames third-party attorneys for Trust Title's ongoing breaches of its commitment to transfer sales proceeds the next business day after closing, yet fails to advance any plausible justification for its failure to meet this requirement when it controlled all aspects of 109 "in-house" closings.  In its brief, Trust Title proffers at least 20 different excuses to account for its breaches, but fails to establish any genuine nexus between (a) the excuses and (b) the breaches of its contracts, such as particular cases in which it failed to wire funds in a timely fashion or failed to close.  This disconnect recurs throughout Trust Title's brief, which repeatedly requests that the Court credit Kip Gardner's testimony even when it is contradicted by multiple other witnesses, the documentary record or Kip Gardner himself, along with 14 exhibits that were never admitted as evidence, and five exhibits that were admitted as "demonstratives" of Kip Gardner's testimony.

Ultimately, Trust Title asks that the Court relieve it of the consequences of its business decisions.  But only Trust Title is responsible for its decision to bid the work at $224 or $225 per closing.  Trust Title, alone, blindly assumed the risk that it could find attorneys willing to work for $25 or less.  Trust Title, alone, is responsible for misrepresenting its resources in its proposals, and its hiring decisions after work started, including its decision to hire only two abstractors for the entire state.  And Trust Title, alone, is responsible for its decision to accept every case assigned by HUD, even though it now complains bitterly about the sheer number of those assignments.  These decisions directly led to Trust Title's default.  Accordingly, Trust Title has not carried its burden to prove that its defaults were excusable.

<u>ARGUMENT</u>

As we stated in our opening brief, at trial, the Government proved its prima facie case by showing that Trust Title repeatedly breached its contracts by failing to deliver required services in a timely manner.  These services included: 1) timely disbursement of sales proceeds to the

Government; 2) timely performance of closings; 3) informing HUD of the reassignment of key personnel; 4) performance of 30-year title searches; 5) attendance at third-party closings; and 6) providing good customer service.  The Government further demonstrated that, by November 2010, Trust Title was incapable of making progress in closing the backlog of cases that it accepted because it had stopped paying its employees and vendors, leading employees to quit and vendors to withhold their services.  Although Trust Title sets forth excuse after excuse for its poor performance, few respond to breaches underlying the default.  Instead, Trust Title spends the rest of its brief describing various business challenges, none of which constitute a breach of contract by the Government or meaningfully respond to the Government's prima facie case. Given that Trust Title has not met its "burden of proving that the default was excusable under the terms of the contract[s]," the default terminations should be sustained.  *Airport Indus. Park v. United States*, 59 Fed. Cl. 332, 338 (2004).

I.      <u>Trust Title Has Not Proven That Its Defaults Were Excusable</u>

      A.      <u>Trust Title Cannot Justify Its Failure To Disburse Sales Proceeds In A Timely Manner</u>

At trial, and in our opening brief, we demonstrated that Trust Title repeatedly breached the requirement to wire sales proceeds to the Government by 2:00 p.m. on the next business day after closing.  *See* DX 15 at 6, 20.[1]  Out of approximately 500 closings for which Trust Title collected a fee, Trust Title met this requirement on only 10 out of 238 closings on the east contract and on five out of 258 closings on the west contract.  DX 90.   Although Trust Title contends in its brief that buyers' attorneys are responsible for Trust Title's repeated breaches of this important requirement, DX 15 at 6, the evidence shows that Trust Title's performance was equally bad whether it performed an in-house closing or a buyer's attorney performed the closing.

---

[1] Unless otherwise specified our references to DX 15 are applicable to DX 16.

1.    <u>In-House Closings</u>

Significantly, Trust Title has not advanced any excuse for its failure to wire funds in accordance with its contracts when it performed in-house closings.  In these cases, Trust Title controlled all aspects of the closing, including when deeds were recorded, the receipt and disbursement of funds, and the preparation of the HUD-1.  Nonetheless, for the 109 in-house closings performed on the two contracts, Trust Title transferred sales proceeds to the Government by the next business day after closing on only three occasions.  DX 90, 227, 229. With respect to the remaining 106 in-house closings Trust Title was not merely a few hours or even a day late; on average, it failed to wire funds to the Government well in excess of five business days after the closing occurred.  *Id.*  During cross examination, Kip Gardner admitted that for the 109 in-house closings there were "maybe" one or two occasions where the lender failed to disburse the funds to Trust Title in a timely manner.  *See* Tr. 641/7–642/4.  Neither Kip Gardner nor Brian Buchanan, Trust Title's CFO, provided any explanation as to why Trust Title held sales proceeds for days or weeks after it performed in-house closings.  Thus, Trust Title's failure to rebut our prima facie case that Trust Title's repeated breaches of its commitment to wire the funds by no later than 2:00 p.m. the next business day by itself constitutes adequate ground to uphold the default terminations.

2.    <u>Closings Performed By Third-Party Attorneys</u>

In our post-trial brief, we observed that, while Kip Gardner had expended much effort over several days of testimony attempting to shift the blame for Trust Title's repeated breaches of the disbursement requirements on to third-party attorneys, we saw little evidence to corroborate his testimony.  Indeed, we established that Trust Title was responsible for failing to wire sales proceeds in connection with third-party closings because Trust Title employees did

not attend them.  Gov't Br. at 35-36.  Given that no Trust Title representative was present at such closings to retrieve the necessary paperwork and ensure timely recording, Kip Gardner admitted that Trust Title purposefully withheld funds owed to the Government until that information "was sent to us."  Tr. 838/16-19.

At trial, Trust Title introduced seven exhibits (PX 345-51) in support of its claim that third-party attorneys were responsible for Trust Title's failure to wire funds no later than 2:00 p.m. the next business day after closing in these particular cases.  These exhibits do not support Trust Title's claim and, in any case, do not explain why Trust Title breached its disbursement obligation in virtually all cases.  Three exhibits show that a third-party attorney recorded a deed a few days after closing.  PX 345-347.  Under these circumstances, Trust Title contends that it cannot be held responsible for any wiring delays because it is not permitted to wire funds prior to recordation.  First, none of these cases justifies Trust Title's failure to timely wire funds from the roughly 500 other closings to which these exhibits do not speak.  But even if Trust Title's performance were measured from the date of the recording, it still transferred funds weeks after recordation.[2]  PX 345-47 only serve to prove the Government's case because they further show that Trust Title's arguments about recording dates do not explain its late wiring of funds.

|  | Date of recording | Date funds disbursed (DX 90) | Business Days Elapsed |
|---|---|---|---|
| PX 345 | September 28, 2010[3] | October 22, 2010 (DX 90 line 413) | 17 |
| PX 346 | September 24, 2010 | October 12, 2010 (DX 90 line 617) | 11 |
| PX 347 | September 20, 2010 | November 1, 2010 (DX 90 line 823) | 29 |

With respect to PX 348, the deed was recorded on the same day as the closing, September 16.  *Compare* PX 348 *with* DX 90 line 393 and DX 105 at p. 240.  Kip Gardner testified that

---

[2] Comparisons between PX 345-351 and DX 90 and/or DX 105 are made by comparing the FHA case number and/or the property address.

[3] Trust Title's notes indicate that the third-party attorney, Walter Palmer, was waiting for *Trust Title* to send the deed to him.  "09/23/2010 07:04·PM dchitwood **Dawn -- Any news on the HUD or tracking number for the Deed. I am going to Bladen this afternoon, and would like to record today . Please advise. Thanks -- Walter**."  DX 105 at p. 17.

Trust Title could not disburse funds by the next business day, however, because it did not receive a deed from the third-party attorney until October.  This assertion is contradicted by the last page of the exhibit, which suggests that deed recordation information was available online although a Trust Title employee did not locate it until October 6.  PX 348 at p. 13.

The other three exhibits, PX 349-351, do not show any recording information at all.

- PX 349.  According to Kip Gardner, disbursement of the sales proceeds for this one property could not occur until this fax was received on October 19, 2010.  Tr. 783/24–784/5.  Notably, the fax cover sheet indicates that a fax from the same firm concerning the same property was sent to a Trust Title employee on September 23, 2010 -- the date following the settlement.  Trust Title's notes for this file, moreover, indicate that a revised HUD-1 was sent on September 20 and on September 22, the notes state: "Changed settlement status from: Firm to: Closed."  DX 105 at p. 347.

- PX 350 is a copy of an October 21, 2010 fax transmitting a HUD-1 statement. Trust Title's notes indicate that on September 14, Jonathan Dees "Changed settlement status from: Firm to: Closed."  But even if Trust Title received the HUD-1 for the first time on October 21, 2010 and could not transfer funds until then, Trust Title did not transfer the funds to the Government until October 25, so Trust Title would still be in breach.  DX 90 line 508.

- PX 351 is a fax cover sheet attaching a HUD-1 that states "already faxed + mailed to trust title on 9/20/10."  Again, even if Trust Title received the HUD-1 for the first time on October 19, 2010 and we accept that Trust Title could not transfer funds until then, Trust Title did not transfer the funds to the Government until October 25, so Trust Title would still be in breach.  DX 90 line 432.

These exhibits do not establish that third-party attorneys routinely waited for several days after the settlement to record the deed nor do they show that Trust Title timely wired sales proceeds after recordation.  Further, these exhibits fail to explain why hundreds of other wire transfers were made days or weeks after the closing.  Aside from inconclusive and contradictory information about seven closings, Trust Title has not presented any other evidence showing that third-party attorneys were responsible for the extensive delays for wire transfers in hundreds of other cases.  Indeed, the record suggests that the impact of the third-party attorneys was minimal

because Trust Title's wiring of funds was only marginally worse on third party transactions vis-à-vis in-house closings.  *Compare* DX 227 & 229 with DX 228 & 230.

Moreover, to the extent that Trust Title contends that it wired funds to HUD as soon as it received them from attorneys, Pl. Br. at 39, a review of Trust Title's banking records demonstrates that this claim is false.  Trust Title's banking records establish that Trust Title held on to  sales proceeds long after it received wire transfers from buyers' attorneys.  For example, Trust Title's western North Carolina banking records are at PX 343.  The details with respect to particular transactions begin on page 20 of PX 343.  Page 21 of this exhibit indicates that Trust Title received a wire of the proceeds of a sale on October 1, 2010, in the amount of $164,008.37, but that it did not wire the funds to HUD until October 27.  *Compare* DX 90 line 826 (indicating that Trust Title received the wire on the day after closing but waited 26 more days to wire the proceeds to HUD).  The following transaction on PX 343 shows that Trust Title received a wire of sales proceeds on September 16 in the amount of $107,994.39 but waited until October 1 to wire the funds to HUD.  Trust Title had received these funds within two days of closing, but waited an additional 14 days to wire them to HUD.  DX 90 line 121.  Two transactions after that (PX 343 at p. 22) shows that Trust Title received a wire of sales proceeds on October 25 in the amount of $50,467.06 but failed to wire to HUD until November 2.  The next transaction shows that Trust Title received a wire of sales proceeds on September 21 but waited three business days, September 24, to wire the funds to HUD.  *Id.* at 23.  The following transaction shows that Trust Title received another wire of sales proceeds on September 21 but waited until October 7 to wire those funds to HUD.  *Id.* at 24.  We could go on, but it suffices to say that this document continues for 300 more pages and it contains many more examples of long gaps between Trust Title's receipt of funds from the buyer and its own wire to HUD.

3.      Trust Title's Remaining Excuses For Its Repeated Breaches Of The
Contractual Wiring Requirements Are Meritless

Aside from blaming third-party attorneys, Trust Title largely ignores our discussion of its

failure to satisfy the wiring requirements in its brief, even though this default is central to our

prima facie case.  To the extent that Trust Title addresses them, Trust Title effectively suggests at

page 37 of its brief that the Court should apply a "no harm, no foul" rule because it didn't

actually steal any funds from HUD.  It contends that, because one rationale underlying the

requirement that the closing agent disburse funds by the next business day after closing was a

concern that the closing agent would embezzle sales proceeds, and Trust Title never engaged in

such conduct, then its breach amounts to nothing.  This argument is specious.  Simply because

Trust Title did not embezzle money from the Government does not mean that it failed to meet its

commitments under its contracts to wire sales proceeds by 2:00 p.m. the next business day.

Moreover, the fact that Trust Title held onto sales proceeds, in many cases for more than 15

business days after it performed a closing, certainly did not give HUD comfort that its money

was secure.  DX 227, DX 299; Tr. 173/6-17.  In any event, Trust Title's breach of its obligation

to wire sales proceeds goes beyond concerns regarding commingling or embezzlement; it also

deprived the Government of the use of its funds for days or weeks, and HUD did not need to wait

until its money had been stolen before it took action to enforce its contractual rights.  As we

demonstrated in our opening brief, HUD is entitled to strict compliance with its contracts.  Gov't

Br. at 26 (citing *e.g.*, *Farwell Co. v. United States*, 148 F. Supp. 947, 950 (Ct. Cl. 1957)).

Lacking any legitimate excuse to account for these repeated and uncured breaches, Trust

Title employs the following tactics: 1) mischaracterizing the terms of its contracts; 2) continuing

to blame unnamed third-party attorneys who supposedly failed to provide funds to Trust Title in

a timely manner; and 3) misstating Dale Fussell's testimony.  All of these attempts fail.

a.      Trust Title Was Not Terminated Because It Did Not Disburse Sales
        Proceeds Before Recording

First, Trust Title improperly contends that HUD demanded sales proceeds "instantly" and "did not understand that was impermissible under North Carolina law….All documents had to be recorded…before funds could be disbursed under North Carolina law." Pl. Br. at 33, 37.  This argument fails because HUD never demanded the "instant" transfer of funds; it required that Trust Title transfer funds by no later than 2:00 p.m. the next business day after closing, as Trust Title promised in its proposals and contracts.  DX 3 at HUD1992;[4] DX 15 at 20.  The September 16, 2010 cure notice correctly cited this requirement.  DX 50 at 2.  But Trust Title never cured this breach.  Moreover, in the November 9, 2010, termination letter, the contracting officer stated that at the October 27, 2010 meeting with Kip Gardner and his counsel, Trust Title had left that meeting with "an absolutely clear understanding" that HUD wanted all outstanding sales proceeds wired by October 29.  DX 76 at 1.  Trust Title continued to defy HUD and, by the time of termination, nearly two weeks after the October 27 meeting, HUD had still not received the majority of the sales proceeds.  *Id.*

The no-later-than-2:00 p.m. commitment may have required Trust Title to accomplish recording and disbursement in a fairly narrow window of time, but even Kip Gardner admitted that it was possible for Trust Title to satisfy this term of the contracts, Tr. 467/6-15; Trust Title just failed to do so.  Importantly, HUD never demanded that Trust Title disburse sales proceeds before recording and it was not cited as a basis for the default terminations.  DX 50.  Accordingly, alleged "confusion" regarding table funding did not cause Trust Title to breach its commitment to wiring funds by 2:00 p.m. the next business day after closing.  Pl. Br. at 35.

---

[4] Unless otherwise specified, our references to DX 3 are applicable to DX 4.

b.      Trust Title's "Humanitarian Efforts" Do Not Excuse Its
Failure to Wire Funds Timely

In an effort to distinguish itself from Dale Fussell's operation, which was able to meet the

wire transfer requirement for nearly every closing -- third-party or in-house -- Trust Title

contends that it should be excused for its breaches because "Canceling settlements because

[buyers] had difficulty either with title issues, their own funds, checks versus money orders

supplied and other procedural problems, was not a humane way to proceed."  Pl. Br. at 38.  Dale

Fussell explained that, on occasion, there were situations when it was late in the day of the

closing and a third-party attorney told him that he could not obtain funds from the buyer or the

lender, and was not in a position to record the deed.  Tr. 589/10-20.  In such cases, Mr. Fussell

would cancel the scheduled closing until the buyer had the funds and paperwork to proceed.  *Id.*

By contrast, Trust Title would "press on" in these circumstances.  Pl. Br. at 34.  Trust Title

unabashedly contends that this was the right decision because it got people into their homes

faster.  *Id.*  While it may be true that it got some buyers into their homes faster, these people

were not yet in a position to pay for their homes.  Although Kip Gardner may have told himself

that Trust Title was doing "humanitarian work," if true, he was actually facilitating the

conveyance of HUD properties in the mere hope that the buyers would later pay for them; Trust

Title did this without the consent of the party it represented and concealed this practice from

HUD.  Despite Trust Title's attempt to manipulate the facts, its breach of its contractual

obligation to HUD to ensure that sales proceeds were wired in a timely fashion was no virtue.

c.      Trust Title's Self-Comparison To The O'Brien Law Firm Is
Irrelevant

Finally, Trust Title favorably compares itself to the predecessor contractor, the O'Brien

Law Firm (O'Brien), by contending that O'Brien only met the next day wiring requirement by

borrowing from its escrow funds.  Pl. Br. at 35.  However, Trust Title has not presented

documentary evidence or testimony from a witness with personal knowledge that supports this

contention, and it should be disregarded.

      B.      <u>Trust Title Cannot Show That Its Failure To Make Progress Was Excusable</u>

      In our opening brief, we demonstrated that Trust Title closed fewer than half of the cases

it was assigned and, of the cases that Trust Title closed, it closed fewer than half within the

buyer's 45-day window established by HUD's standard form sales contract.  DX 235.  More

significantly, the number of cases Trust Title closed peaked during the week of September 27,

2010, but steadily declined after that, in the weeks leading up to the termination.  *Id.*

      By the week of August 23, 2010, however, the number of cases pending was always

above 600.  At no point after did Trust Title make a meaningful dent in that number.  By the

week of September 13, 2010, when the cure notice was sent and the contracting officer requested

a written plan to address the volume, the number of pending cases increased to 770; and by the

week of October 4, 2010, when the show cause letter was sent, 731 cases remained pending  DX

235.  Indeed, as of the week of November 8, 2010, 639 cases were still waiting to close.  In

response to the contracting officer's request for a plan detailing how Trust Title would reduce the

backlog, at the October 27 meeting, Trust Title offered nothing but a demand for more money.

DX 70 at 3.  This demand, along with the steady deterioration of Trust Title's performance and

its inability to reduce the volume of outstanding closings, led the contracting officer to conclude

that it was not possible for Trust Title to improve its performance and proceed in accordance

with the contracts.  Tr. 915/21-23, 916/8-13.

      In its brief, Trust Title offers a grab bag of contentions that attempt to excuse its breaches

and shift the blame for its own shortcomings on to HUD.  It takes no responsibility for its own

actions or decisions.  The scattershot approach in Trust Title's brief makes it impossible to determine whether HUD's alleged shortcomings, even if credited as true, had any real impact given Trust Title's poor business decisions.[5]

        1.     The Number Of Cases Assigned Does Not Excuse The Backlog
               That Accumulated During Trust Title's Performance

We are told on page one of Trust Title's brief that the number one "most disturbing" thing that HUD did was to assign Trust Title 600 cases in the first two weeks of contract performance, as if Trust Title were an innocent bystander in these assignments.  In our opening brief, we observed that Kip Gardner had variously testified that HUD assigned 650, 750, and 763 cases during the first 30 days of performance.  Gov't Br. at 8.  Trust Title does not clarify the number in its brief, but it now contends that "HUD assigned twice the volume permitted under the contract."  Pl. Br. at 14; *see also id.* at 11 ("HUD doubled the cases Trust Title was to receive the first month"); *but see* Pl. Br. at 1 (600 cases in first two weeks); *id.* at 9 (540 cases in first 30 days); *id.* at 47 (600 cases in first four weeks).  This misstates the contract requirement because there was no "permitted" number.  In fact, the contracts contemplated the very scenario that Trust Title experienced; namely that the volume of cases could exceed Trust Title's resources, and the contracts provided Trust Title with very important protections in that regard.  *See* DX 15 at 44.  Each contract contained FAR clause 52.216-19, Order Limitations (OCT 1995), which allowed Trust Title to refuse assignments greater than 195 over a 30-day period.  This provision did not, however, place a ceiling on the number of closings HUD could assign.

---

[5]  It is undisputed that part of the reason for the large number of assignments in August was that HUD did not have a contractor to assign closings to in July.  However, as Dale Fussell testified, there is often a "huge surge in the summer."  Tr. 572/7.  In any event, Trust Title exaggerates the duration of the period for which HUD did not make assignments from one month to a three-month period.  Pl. Br. at 58.  Ralph Jackson testified that HUD continued to assign closings to O'Brien up through June 30, that O'Brien closed all cases assigned before the contract end date, and that Trust Title began work by early August.  Tr. 61/22–62/6.

Kip Gardner testified that he fully understood that HUD was required to assign every case for which it needed closing agent services to Trust Title unless Trust Title provided written notice to the contracting officer of its intent to refuse any assignments.  Tr. 388/25-389/3 (Q. And did you understand that -- or was it your understanding that without providing that notice that HUD was required to continue ordering from Trust Title? A. Yes, it's in the contract).  Thus, the contract left it to the business judgment of the contractor as to how many assignments it could perform, if any, above 195 per contract over a thirty-day period.

Why Trust Title accepted so many assignments is the great mystery of this case.  The order limitations clause is devastating to Trust Title's case, but it never mentions it in its brief.  It does, however, state that it would be "completely unrealistic" to expect it to refuse any cases because, it suggests, this would have made the contracting officer unhappy.  Pl. Br. at 14.  There is nothing in the record that suggests that HUD preferred Trust Title accept all cases and perform them incompetently rather than refuse some cases and perform the ones it accepted in accordance with its contracts.

          2.     Trust Title's Expectations Regarding Volume Are Inconsistent With Its Contracts

Trust Title also contends that it planned the work with an expectation that it would receive 10.5 cases per day and that "It certainly would not have had to work on 600 contracts at the same time as ultimately occurred."  Pl. Br. at 13.  Trust Title later concedes in its brief, as in its proposals, that the work might include surges, then attempts to qualify that "surges could only occur after an appropriate ramp up had been completed," they are "generally associated with heavier volume at the end of the month," and they "certainly did not include being dumped with 600 cases which were stale and incomplete during the first several weeks of performance on a contract with a new client."  Pl. Br. at 23.  However, Trust Title signed requirements contracts

that contain no limitation on how many cases HUD could assign on a daily, weekly, or monthly basis.  DX 15 at 3 and 43-44.  Trust Title's insistence that the contracts obligated HUD to assign cases at a steady  rate of 10.5 cases per day per contract demonstrates its misunderstanding of the terms of the contracts it executed and is, in fact, contradicted by Kip Gardner's own testimony acknowledging that there was no minimum or maximum.  Tr. 387/16–389/3.

      C.      **Trust Title Fails To Provide Any Meaningful Excuse To Justify Its Other Breaches Of The Contracts**

            1.      **Trust Title Failed To Comply With The Contracts' Personnel Requirements**

Trust Title agreed in the contracts that certain identified people were essential to the work being performed.  DX 15 at 49, HUDAR 2452.237-70(b).  Trust Title agreed to notify the contracting officer reasonably in advance prior to diverting any of these employees and to submit a justification, including proposed substitutions.  *Id.*  As we demonstrated in our opening brief, Trust Title breached the contracts by failing to notify HUD that a number of the Key Personnel listed in its proposals and contracts were, in fact, never Trust Title employees and were not replaced.  Trust Title's brief does not provide an excuse for this breach.

In our opening brief, we also cited testimony from Cindy Radabaugh and Dale Fussell that Trust Title's failure to hire enough employees had a material impact on its work.  Gov't Br. at 11-12.  Cindy Radabaugh testified that, among other things, the inability to obtain title searches had a significant impact on her ability to close cases.  Tr.  298/6–299/4.  Dale Fussell testified that Trust Title "did not have enough people working.  They simply didn't have enough people for the volume [of work] that they were trying to handle."  Tr. 530/19-21.

Although Trust Title now attacks Ms. Radabaugh and Mr. Fussell's testimony, there is plenty of other evidence that demonstrates the lack of manpower.  For example, Chaz Seale,

hardly a hostile witness to Trust Title, wrote in a September 18, 2010 email that the number one thing Trust Title needed was more employees.  DX 239.  Similarly, real estate agent Buzz Armstrong wrote to HUD on October 14, 2010, complaining that "we can't get TTC employees to pick up the phone" and that he could "never get a live human or a name of someone as a contact.  It's like a black hole."  DX 64 at 8.

Despite all the evidence, Trust Title nevertheless contends that it adequately staffed the contracts.  It does not, however, provide any primary source materials such as billing or time records or even testimony from some of the people involved.  Instead, it relies entirely on a spreadsheet that Kip Gardner and Brian Buchanan created two years after contract performance in support of a termination for convenience proposal.  PX 370; Tr. 819/8-19.  The spreadsheet assigns a percentage full-time equivalent for each person listed, but Mr. Gardner admitted on cross examination that the percentages do not come from Trust Title's records but instead represent subjective determinations made at least two years after the fact.  Tr. 820/5-7.  However, even a cursory examination of this document demonstrates that it is unreliable.  In unchallenged testimony, Cindy Radabaugh testified that Mark Vesich only worked for Trust Title for a few weeks.  Tr. 326/24–327/5.  Yet, in PX 370, Mr. Vesich is assigned the highest possible number, 1.00, despite his brief tenure and the fact that he was not replaced.  Tr. 327/4-5.  Similarly, Shaunta Staples, Dorothy Swint, Cindy Radabaugh, and Jonathan Dees are also assigned a 1.00 even though they either left before the terminations and/or were not there at the beginning of performance.  Tr. 282/17-19; 292/18-24; 337/19–338/7; 338/22.  And for at least half the employees on PX 370, there is no testimony that explained what, if anything, they did on the HUD contracts.  Accordingly, PX 370 does not support Trust Title's contention that it adequately staffed the contracts in light of the countervailing evidence to the contrary.

2.      Trust Title Failed To Perform 30-Year Title Searches

We demonstrated in our opening brief that Trust Title failed to perform 30-year title searches required by the contracts.  DX 15 at 14, C.5.2.A.3 and at 19, C.5.3.4.b.  As Cindy Radabaugh testified, Trust Title's inadequate staff of abstractors could not keep up with the work, and it became routine practice for Trust Title to request title searches from third-party attorneys.  Tr. 298/6–299/4; 307/15-24.  Indeed, Chaz Seale instructed Trust Title employees to request copies of buyers' title searches because Trust Title needed "to back-fill with a full 30-year search for HUD."  DX 246.

Trust Title does not deny this in its brief.  It contends, however, that this practice benefited HUD because it allowed Trust Title to bid a lower price and, in any case, that it paid for insurance if there were any mistakes.  Pl. Br. at 68.  While it may be true that a contractor can bid a lower price if it does not intend to perform some of the work required by the contract, this does not excuse Trust Title's breach to perform 30-year title searches for every closing.  HUD also required Trust Title to obtain insurance.  DX 15 at 7, C.1.3.C.  Obtaining insurance did not obviate the responsibility to perform title searches.  The contracts required Trust Title to do both.

3.      Trust Title Failed To Attend Third-Party Closings

Trust Title failed to attend third-party closings required by the contracts.  DX 15 at 6, C.1.1.A.  As discussed above, this breach contributed to Trust Title's failure to wire funds in a timely fashion after third-party closings.  Cindy Radabaugh testified that the only time that the Charlotte office ever attended a third-party closing was when Trust Title tried to dupe HUD representatives into believing that the Charlotte office was a full-fledged office, complying with the contracts, during a site visit.  Tr. 323/10–324/18.  Chaz Seale testified that he didn't have the

time or "correct schedules" to comply with this contract requirement.  Tr. 1087/3–1088/10.

None of Trust Title's excuses justifies these ongoing breaches.

Trust Title first contends that the Government caused its failure to attend third party

closings by assigning nearly two times the number of cases that Trust Title expected.  Pl. Br. at

69.  But, as we have established, Trust Title could have declined more than 300 of the assigned

closings.  Alternatively, Trust Title could have hired additional employees to handle the

workload but it elected not to do so.  Tr. 458/17-21.  By accepting more closings than it could

perform, Trust Title did not acquire carte blanche to breach the contracts.

Moreover, as we have established, Trust Title did not shift the bulk of the work to third-

party closings because of the volume.  Rather, it was part of Trust Title's "preferred lawyer"

strategy that would enable Trust Title to get free legal supervision required by North Carolina

law.  *See* Gov't Br. at 15.  By contrast, on in-house closings, Trust Title had to pay Dale Fussell

and John Hazlehurst $125 to $150 per transaction.  DX 128 at 2; Tr. 452/2-19; Tr. 535/21–536/3.

Because these payments consumed more than half of Trust Title's closing fee, it was much more

advantageous for Trust Title to shift the work to third-party attorneys and coerce them into

sharing their work product.

After taking the position that HUD caused its failure to attend third party closings by

assigning too many cases, Trust Title switches positions in the very next paragraph, contending

that it attended third party closings by runner.  Pl. Br. at 69.  No evidence is cited in support of

this contention.  To the extent that Trust Title had a runner attend third party closings, this was

the exception rather than the rule because Trust Title employed just one runner, and she only

worked at the company for "Not a long period of time."  Tr. 409/5-20.

4.     Trust Title Failed To Provide Adequate Customer Service

As we established in our opening brief, the performance work statements provided at
C.1.8, Customer Service, that "Inasmuch as the Closing Agent's performance reflects directly on
the Department, customer service is a priority under this contract."  The Closing Agent shall
work to perform the highest level of customer service to HUD's homebuyers and real estate
brokers."  DX 15 at 9; Gov't Br. at 36-37.  Kip Gardner admitted during his testimony "It was
the worst level of customer service our company had ever experienced."  Tr. 717/16-17.

Trust Title's only response to this breach is to once again point to the number of cases
assigned which, in this section of its brief, it quantifies as HUD's assignment of 600 cases in the
first four weeks of performance.  Pl. Br. at 47.  Of course, this just leads back to the same
question: why did Trust Title decide to accept so many cases beyond its ability to close them that
HUD received what Ralph Jackson characterized as a "deluge of complaints"?  Tr. 65/18-24.
Trust Title cannot show that its failure to provide adequate customer service is excused by its
voluntary acceptance of work that it could not perform.

D.     Trust Title's Argument About A "Time Extension" Is A Red Herring

Trust Title spends the first 30 pages of its brief contending that it was entitled to an
"extension of time" of anywhere from 30 to more than 100 days.  Indeed, Trust Title identifies
its entitlement to an extension of time as the "one overall question presented by this case."  Pl.
Br. at vii.  As we explain below, there are several problems with this contention and,
significantly, there is no narrative that Trust Title can spin pursuant to which a claimed
entitlement to a time extension would excuse its failure to wire sales proceeds in a timely
fashion.

1.      Trust Title Failed To Seek Relief Pursuant To The Contracts For
Any Delays

In support of its claim that it was entitled to unspecified time extensions to its contracts under the Protests clause, Trust Title relies upon Federal Acquisition Regulation (FAR) section 52.233-3, Protest After Award (AUG 1996), which allows the contracting officer to extend the period of performance in the event of a bid protest, and, in this case, there was a bid protest on the west contract.  But this claim fails to excuse Trust Title's default for several reasons.

First, the clause requires that the contractor request the time extension within 30 days after the end of the work stoppage.  Trust Title never requested extensions to its closing agent contracts from the contracting officer, as required pursuant to FAR 52.233-3.  Tr. 400/23–401/1. Moreover, the issue on the east contract was lack of funding; there were no bid protests.  And instead of seeking a time extension on that contract, Trust Title signed a bilateral modification on July 27, 2010, which increased overall funding, and pursuant to which Trust Title reaffirmed its commitment to all remaining terms and conditions of the contract without an adjustment to the performance period or price.  DX 115.

Second, Trust Title's brief contains no analysis that explains how FAR 52.233-3 applies to the facts of this case.  The utility of this clause can easily be imagined in, for example, a building construction project, where the contract term is 12 months and the entire time will be needed for construction.  In such a case, the contractor may request that 30 days be added to the end of the contract to replace 30 days lost during a protest.  The application of this clause is less apparent to the facts of this case, where the contractor did not build a structure, but was supposed to close real estate transactions on an ongoing basis.  Adding 30 or more days to the end of the base year of the contracts would not have helped Trust Title close the cases HUD assigned in August of 2010.

2.      Trust Title Fails To Establish Any Nexus Between The Stop Work
Order And Its Inability To Close The Cases It Accepted

The causes of Trust Title's inability to perform in a timely manner were entirely Trust Title's fault and are set forth at length in our opening brief.  Trust Title was awarded the contracts because it lied to HUD by representing that it had a full staff of competent employees in both North Carolina offices when, in fact, no one affiliated with Trust Title lived in North Carolina other than its vice chairman, Chaz Seale.  Tr. 235/7-9.  If Trust Title had divulged that it would need a ramp-up time to hire employees, the contracting officer would have rejected Trust Title's proposals as technically unacceptable, just as she did with the R.L. Scott Law Firm.  S*ee* DX 11 at 3.  Trust Title also lacked financial resources, attorney supervision, and office space, which forced it to work out of Chaz Seale's kitchen without computers or telephones for the first two to three weeks of the performance period.  Although it was not prepared to perform, Trust Title made the decision to not to refuse a single assignment in the first 30 days of the contract term or at any other point.  Tr. 394/25–395/1.  As Mr. Gardner testified, "chaos" followed this poor business decision.  *See*, *e.g.*, Tr. 373/24, 397/18-20.

As Cindy Radabaugh, the former head of Trust Title's Charlotte office testified, Trust Title's failure to close cases had nothing to do with any purported HUD delays.  Ms. Radabaugh testified that she was capable of closing eight to 10 cases per day.  Tr.  295/21-22.  Even if she and her colleague, Dorothy Swint, were closing only five transactions per day and the Raleigh employees were closing the same number, she believed that they could work through the initial assignments.  Tr. 297/20 - 298/5.  Based on Ms. Radabaugh's testimony, the two offices combined should have been closing 100 to 200 cases per week, but Trust Title never approached even the low end of that range.  DX 235.  The problem, according to Ms. Radabaugh, was that

Trust Title routinely failed to perform title searches per its contracts and was beholden to third-party attorneys to obtain that information.  Tr. 298/6-13.

Trust Title concedes that it had only two in-state abstractors.  Pl. Br. at 72.  It also represents that it had a staff in Florida that could do online title searches, but it formulated its CLIN prices based on an estimate that it could perform only 35 out of 195 title searches online.  Tr. 353/18-25; DX 236.  North Carolina is a large state (more than 53,000 square miles) and two abstractors would have been hard pressed to perform the title searches on 390 case assignments per month.  For the 700+ assignments that Trust Title accepted in the first month, it is doubtful that the abstractors could have performed the searches even if they had traveled by helicopter between courthouses.

         3.     <u>Trust Title's Other Claims Regarding Delays Are Meritless</u>

Trust Title makes a variety of other contentions in its brief, including that the files were missing data when it received them and vague allegations that HUD failed to cooperate.  However, as we demonstrated in our opening brief, Trust Title never complained to the contracting officer or HMBI during the course of the work about missing information.  Significantly, Trust Title has not identified a single case where it informed HUD that, because a file was missing information, it needed additional time to conduct a closing and that HUD denied that request.

Trust Title also contends that the bid protest caused the loss of: potential employees; a law firm that would provide supervision; and office space.  *See*, *e.g.*, Pl. Br. at 8.  However, Trust Title does not identify the names of anyone it lost and there is no evidence that shows that the passage of 27 days (on the east contract) in a depressed real estate industry caused the loss of all of these people.  *See*, *e.g.*, Tr. 547/16 (Fussell testifying that his real estate practice was

"terrible" during this period).  At the same time, Kip Gardner admitted that Trust Title was doing work in preparation for the contracts during the stop work order period.  Tr. 392/16-18.  In reality, the problems were of Trust Title's making.  It did not have employees in North Carolina to lose that July, despite its representations to the contrary in its proposals and its contracts.  DX 3 at 11; DX 15 at 49; Tr. 235/4-9.  As we demonstrated, the lack of consistent attorney supervision was due to Trust Title's incorrect assumption that it would pay $25 per closing for attorney supervision, and its failed attempts to get attorneys to work for free under the so-called "preferred lawyer" strategy.  Gov't Br. at 14-17.  Trust Title simply did not have a high enough contract line item (CLIN) price to pay market rates for attorney supervision.  Thus, on July 1, 2010, Chaz Seale informed one attorney that Trust Title was still evaluating its needs and cited the "extremely tight financial expenditures that are allowed."  DX 233.

As for the alleged loss of office space, there is no evidence that supports this contention. With respect to the west contract, Chaz Seale's testimony contradicts Trust Title's brief.  Mr. Seale testified that he found the site that Trust Title wanted in early July, but held off leasing it because of the protest.  Tr. 1050/25–1051/8.  Trust Title ultimately selected the space in Charlotte because it was close to HMBI.  *Id.*  Once the protest ended, the space was still available.  *Id.*  On the east contract, Trust Title selected the site because it was next to Wayne Roper's office (the attorney who temporarily provided supervision).  Tr. 1051/10-17.  In any event, Trust Title does not explain how office space excuses its default.

In fact, all of Trust Title's delay-related contentions contain the same flaw: Trust Title makes an allegation, and then the Court is asked to assume that it caused a delay and that the delay was material to the default.  But Trust Title never establishes a nexus between HUD's alleged actions and Trust Title's breaches, and it never quantifies the impact of any HUD action.

In their testimony, Cindy Radabaugh, Dale Fussell, and Kip Gardner all agreed that a case could be closed in as little as one to two weeks.  Tr. 300/20-21; 527/23-24; 825/19-22; 826/10-12 (Trust Title's projections contemplated two weeks for closings).  This means that there was sufficient time for Trust Title resolve any issues that came up and close the case without impacting the buyer's contract but it never explains why that was not enough.  And even if the initial "surge" of cases caused some initial disruption, given Cindy Radabaugh's unchallenged testimony that she alone could have closed up to 10 cases per day, there is no excuse for Trust Title not to have been conducting over 100 in-house closings per week by mid-September -- that is, if it performed sufficient title searches, DX 214, and hired additional closers.  Tr. 306/13-20.

> E.   Trust Title Fails To Demonstrate That It Had The Financial Capacity To Perform The Contracts

As we demonstrated in our opening brief, when Trust Title was awarded the contracts, it was struggling financially.  It had closed the majority of its offices, lost dozens of employees, and experienced sizable declines in revenue in the first half of 2010.  Tr. 201/8–202/23; DX 133. In July of 2010, it was not able to meet its entire payroll.  DX 82.  The HUD contracts were not a good match for Trust Title's financial condition because they require the contractor to make an investment long before it can recover those costs by collecting fees from closings.  Eager to obtain HUD contracts, Trust Title offered to perform closings at $224 or $225 per closing, gambling that it could implement a preferred lawyer strategy and find attorneys who would perform legal work for free.

Trust Title could not close cases fast enough to get past the initial financial strain.  Cindy Radabaugh never closed the eight to 10 cases per day that she was capable of because Trust Title never hired enough abstractors.  Tr. 297/20–298/13.  Other than a few weeks by Kip Gardner's

friend Wayne Roper, Trust Title could not find attorneys willing to work for free, and the impact

on Trust Title's progress was significant.  As Chaz Seale recognized in his September 18, 2010

email, "One of the most important things that can be done is to find a couple more attorneys right

away."  DX 247.  Accordingly, Trust Title was forced to pay Hazlehurst and Fussell $125 to

$150 per transaction, an unsustainable amount based on Trust Title's $224 CLIN price.  When

Trust Title could not pay its employees and vendors in October, they quit or stopped providing

their services.  Tr. 337/6; 337/19–338/7; DX 206; DX 210.

Trust Title does not deny any of this.  It once again blames HUD for its inability to pay

its employees, contending that it could not pay them because HUD stopped assigning cases and

"it had no income from the contract."  Pl. Br. at 50.  However, this allegation is so inconsistent

with the record that it further erodes Trust Title's credibility.  In most of its brief, Trust Title

claims that HUD assigned too many; then, Trust Title claims that HUD did not assign enough.

The contracts make no promises that HUD will assign any cases at all.  DX 15 at 43; Tr.

387/16-20.  Kip Gardner conceded this at trial.  Tr. 387/16-20.  In any event, HUD did not stop

assigning cases to Trust Title until the week of October 25, 2010, when there was a bid protest

on the asset manager contract.  DX 235; *see* Tr. 126/17–127/11.  Trust Title's inability to pay its

employees preceded the assignment suspension caused by the bid protest.   As noted above,

Trust Title's did not make full payroll in July.  DX 82.  In an October 18 email from Dawn

Chitwood to Kip Gardner, she reported that the employees "want answers on payroll."  DX 207.

Moreover, even with the suspension, there were hundreds of outstanding cases for Trust

Title to close.  In fact, during the first week of the suspension, there were 678 cases waiting for

Trust Tile to close and 639 remained at termination.  DX 235.  Accordingly, the suspension of

case assignments does not excuse Trust Title's failure to pay its employees or adequately fund its business.

> F.    HUD's Alleged Treatment Of Lakeside Title/O'Brien Law Firm Does Not Excuse Trust Title's Breaches Of Its Own Contracts With HUD

Trust Title contends in its brief that HUD acted improperly because it did not disclose to offerors that the prior contractor novated the contract from a title company to a law firm and that HUD was more tolerant of sub-par work by that contractor.  It also contends that HUD barred Trust Title from a source of revenue that both the predecessor and replacement contractors were allowed to tap.  All of these contentions are in error.

> 1.    Trust Title's Status As A Title Company

At trial, Ralph Jackson, the director of HUD's Real Estate Owned Division, testified that HUD originally awarded the predecessor contract to Lakeside Title & Escrow Agency (Lakeside).  Tr. 157/23–158/2.  Mr. Jackson testified that because of a concern as to whether Lakeside, as a title company, could conduct closings in North Carolina, Lakeside novated the contract to the O'Brien Law Firm.  Tr. 158/3-9.  Mr. Jackson testified that, as result of this experience, HUD changed its standard closing agent contract to ensure that the contractor is responsible for meeting state requirements and licensing.  Tr. 159/6-10.  Thus, HUD's contracts with Trust Title provided: "The Closing Agent shall obtain necessary licenses, insurance certifications, and permits required in the performance of the contract (whether required by common law, practice or otherwise) and comply with any federal, state, county, municipal and local laws, codes and regulations and restrictions applicable to the performance under this contract."  DX 15 at 7.

Trust Title contends that this history shows that HUD "wanted or needed a law firm to perform the work that it gave to a title company, Trust Title."  Pl. Br. at 43.  There is no evidence

to support this claim.  To the contrary, the record demonstrates that a title company can perform closings in North Carolina but it will face some challenges in that North Carolina is an "attorney state" and a title company must have an attorney certify title and supervise deed preparation.  Tr. 535/10-15.  HUD leaves it to the business judgment of each contractor to determine whether it can perform in this environment.

Trust Title was well aware of the challenges presented in North Carolina before it signed the contracts.  For example, Trust Title's Senior Vice President, Dave Masci, advised Kip Gardner on June 25, 2010, that the North Carolina bar had made efforts to require the use of an attorney for all closings.  The bar had relented in the face of Federal pressure but state law required Trust Title to get an attorney opinion on title and prohibited it from preparing deeds.  DX 8; *see* DX 9 (Masci advising Gardner that a state bar committee scrutinizes the work of title companies to ensure that they do not engage in the unauthorized practice of law).  Similarly, attorney Kelly Brady advised Trust Title on May 17, 2010, that "a title agency has a tough battle in North Carolina" and suggested that it "read all of the information on the Authorized practice of law" in North Carolina.  DX 234 at 1-2.  Further, Kip Gardner admitted during his testimony that he was well aware before bidding on and signing the contracts that (1) Trust Title had to perform closings under the supervision of an attorney and (2) the state bar was hostile to the participation of title companies.  Tr. 222/11–223/16; 500/18–501/2.  Accordingly, even if Trust Title did not know about the Lakeside novation, it knew about the legal obstacles to a title company performing closings in North Carolina.

Trust Title contends that HUD treated Lakeside better than Trust Title because it allowed Lakeside to novate to a law firm.  Pl. Br. at 43-44.  But the record demonstrates that Trust Title's status as a title company did not cause its default.  Trust Title knew before entering into the

contracts that, as a title company, it would require attorney supervision for every closing but chose to include only $25 in its CLIN price for attorney supervision. DX 236 at 2; Tr. 357/3-12. As we have established, this gamble failed and it eventually had to pay Dale Fussell and John Hazlehurst $125 to $150 per transaction. The record also demonstrates that Kip Gardner discussed assigning the contract to Dale Fussell. Mr. Fussell took a close look at the deal but ultimately decided that he could not perform the work at the Trust Title CLIN prices. Tr. 547/14–548/18-22. On the other hand, there is nothing in the record that indicates that Trust Title wanted to novate the contract to a law firm. This does not appear to have been possible because Kip Gardner, a non-lawyer, owns 91 percent of the stock in Trust Title. Tr. 199/24. Accordingly, there is no support in the record for Trust Title's contention that HUD treated Lakeside/O'Brien better than Trust Title.

2.      HUD Did Not Tolerate Defective Performance By O'Brien

Trust Title contends that HUD gave O'Brien "great latitude" to work through its performance problems. Pl. Br. at 45. It also contends that HUD administered the O'Brien contract in a "relaxed, non-confrontational fashion unlike the Trust Title contract." *Id*. at 57. The record does not support these assertions.

This case was not about O'Brien, of course, but there is evidence in the record showing that HUD also enforced its contract with O'Brien. The relevant data for comparison are the two issues cited in the termination notice: failure to provide a plan for the backlog of cases and failure to provide for wire transfers in a timely manner. DX 76. O'Brien, like Trust Title, suffered some difficulties at the start of performance but O'Brien, unlike Trust Title, recovered. In a contractor performance report dated March 27, 2006, HUD noted that, while there had been initial delays, O'Brien had been in compliance with the contract since February 2006. DX 62 at

1.  This same document noted that, while there had been initial delays with respect to the wire transfer of funds, O'Brien had improved significantly.  *Id.*  By contrast, after the walk out of Trust Title's employees, there was no way Trust Title's performance could have recovered.  Mr. Jackson highlighted the differences between the two contractors, noting that O'Brien had provided HUD with a written plan to improve performance when asked, had never experienced a walkout of its employees, and had never told HUD that it would only continue work if HUD paid more money.  Tr. 196/11-20.  Accordingly, there is no support for Trust Title's contention that HUD held it to a higher standard than other contractors.

### 3.     HUD Did Not Treat Trust Title Differently With Respect To Charging For "Extras"

Trust Title contends that HUD treated it differently from O'Brien and the reprocurement contractors supposedly because every HUD closing agent in North Carolina, but Trust Title, was allowed to charge for the preparation of documents and for other fees.  Pl. Br. at 56.  It makes two points, neither of which are supported by the evidence.

First, , in North Carolina, when the closing agent is a <u>title company</u>, the title company may charge a fee to buyers for title insurance premiums.  DX 15 at 37; Tr. 352/18-19.  The contracts, in section H.1, Additional Fees, specifically confirm that Trust Title may charge a fee to the buyer "if the purchaser or purchaser's lender demands additional services, such as title insurance outside the contract duties. . . ."  DX 15 at 37.  Trust Title's budget anticipated revenues for title insurance premiums, DX 236; Tr. 355/15–356/2, and, in fact, Trust Title routinely collected premiums from buyers.  *See*, *e.g.*, PX 343 at p.22 (reflecting distribution of two checks to Trust Title: $225 for "settlement agent fees" and $42.50 for "title premium").

In contrast, as Attorney Peter Chastain explained, when an <u>attorney</u> acts as the closing agent, it may "charge an additional fee to the buyer for our closings for preparation of the

documents to obtain title insurance, not the title insurance premium itself, which is prohibited by NC state law."  PX 424 at 4 (emphasis added); *see also* Tr. 616/14-21 (Fussell describing the fees that his firm may charge buyers).  Thus, with respect to title insurance, Trust Title charged buyers for premiums and attorneys charged for document preparation.  There is no evidence that HUD ever barred Trust Title from collecting insurance premiums.

Second, Trust Title argument that it was "told several times that neither it nor a third party attorney…could charge for preparation of documents to obtain title insurance," Pl. Br. at 56, is not supported by the exhibit it cites.  In PX 287, Kip Gardner asked whether *HUD* would pay a third-party attorney to perform closing agent services and HUD correctly responded a few hours later that "If the purchaser wants to use their own closing attorney to close, HUD will not pay."  PX 287 at 2.  There is no evidence in the record that HUD barred Trust Title from charging buyers any fees for title insurance nor is there any evidence that HUD paid third-party attorneys to perform closing agent services under its contract with O'Brien or any of the reprocurement contractors.

G.    Trust Title's Remaining Excuses Do Not Justify Its Default

1.    The Contract Did Not Provide For A Transition Period

In our opening brief, we demonstrated that, contrary to the complaint, the contracts did not provide for a transition period.  Gov't Br. 43-44.  The contracts have no limitations on when or how many cases HUD may assign, other than the order limitations clause, which Trust Title never invoked.  Moreover, we established that, if Trust Title had disclosed to HUD that it would require a transition plan because it had no employees in North Carolina other than Chaz Seale, HUD never would have awarded Trust Title the contracts.  DX 11 at 3.

In response, Trust Title contends that "Clearly the contracts contemplated a transition period." Pl. Br. at 59. Trust Title fails to identify any clear contract language in support, but insists that a transition period is "inherent" in contract provisions. Trust Title then discusses its proposed staffing of the projects but neglects to discuss its false representation that all people listed except one were already Trust Title employees. *See*, *e.g.*, DX 3 at HUD1962. Trust Title contends that HUD should have known that these people were not employees, would have to provide their current employer two weeks' notice, and then would need an additional week to transition into Trust Title. However, there is nothing in Trust Title's proposals or contracts that alerted HUD that "All are employees" actually meant "None are employees."

    2.    Training And The Post Award Conference Do Not Account For Trust Title's Default

In our opening brief, we established that the contracts required Trust Title to assign employees to the contract that were capable of working independently and with demonstrated knowledge, skills and expertise in their respective areas necessary to perform all assigned duties. DX 15 at 11 at C.4.B. In addition, the contracts provide that "If the Closing Agent's personnel do not possess the expertise necessary to perform the tasks required in the contract, then the Closing Agent shall be responsible for appropriate training and/or replacing personnel. *Id.* (emphasis added).

Trust Title ignores this provision in its brief. Instead, it points to another clause, H.15, which allowed the contracting officer to direct Trust Title to attend a one-day training session. DX 15 at 39. However, Trust Title never explains what kind of training it expected from HUD in light of the clause C.4.B obligation that it fully train its own employees. Nor does it identify a single employee who would have benefitted from such training. Nor does it establish any nexus between the HUD training and the issues that led to the default, particularly, the failure to initiate

wire transfers in a timely manner, or its failure to submit to HUD a plan to alleviate the backlog of closings.

Similarly, we also established in our opening brief that the contracts did not require HUD to provide Trust Title with any training in the post-award conference.  In its brief, Trust Title contends that the post-award conference call was less than 30 minutes in length and that "these issues were not discussed" although it is not entirely clear what it means by "these issues."  Pl. Br. at 42.  Trust Title never explains how a longer post-award conference, or one earlier in the performance period, would have had any impact on the issues that led to the default.

### 3.   P260 Does Not Justify Trust Title's Default

In our opening brief, we established that the contracts required Trust Title to do only one task with P260: to scan documents into the closing package that would be provided to HUD's asset manager.  HUD made no promise to Trust Title in the contracts that it would be granted access to any part of P260 other than the module for scanning documents.  HUD did not terminate Trust Title for any delays associated with mailing the documents rather than scanning them into P260.  Trust Title never referenced P260 in its proposals, so HUD had no notice that Trust Title was counting on P260 to help it achieve cost savings.  Tr. 259/11.

In its brief, Trust Title continues to contend that P260 would have improved its performance but it presented no evidence at trial that P260 would have improved its performance in any way.  Trust Title relies on Mr. Gardner's speculation, not evidence.  While he contends that P260 would have helped Trust Title, he was forced to admit on cross examination that he had never actually used P260 before he signed the contracts.  Tr. 261/6-21.  Moreover, Kip Gardner also admitted that he could not quantify the impact P260 would have had on Trust Title's work, either in terms of money or productivity.  Tr. 262/9-17.

The only person who testified that has used P260 in connection with providing closing agent services was Dale Fussell.  He testified that P260 did not make the work any easier.  Tr. 602/14.  He noted that, while there is title search information in P260, he had committed in the contract to perform his own title search.  Tr. 603/3-14.  When asked what impact lack of access to P260 would have on his work, Mr. Fussell responded "None whatsoever."  Tr. 617/4.  He testified that using P260 provides no cost saving.  Tr. 617/13-15.  Importantly, there is no nexus between Trust Title's failure to wire funds in accordance with the contracts and the unavailability of P260.

4.     Complaints About HUD / The HMBI Conference Call /
Subsequent Performance On The Tax Contract

Trust Title also cites a variety of actions by HUD that it claims were either improper or caused delay, but none of them constitute a breach of contract on HUD's part or address the reasons for Trust Title's own breaches.

- Requesting that Trust Title contact a home buyer with a sick husband about a closing on July 27 -- two days after the July 27 modification added funds to its contract.  Pl. Br. at 7; PX 280 at 2.

- Not cooperating with Trust Title to "work through the situation" or "facilitate discussions regarding conflicts and impediments."  Pl. Br. at 21, 26.

- Not approving forms quickly enough.  *Id.* at 41.

- The "Quality Assurance Plan Reversal."  *Id.* at 43.

These complaints are irrelevant because Trust Title fails to identify any evidence that links these allegations to its own breaches or its failure to close any specific cases.  Also irrelevant to this case is Trust Title's performance on an unrelated tax contract.  We have no duty to prove that Trust Title performed badly on another contracts.

Similarly, Trust Title spends five pages quoting statements made on a call with HMBI.  Pl. Br. at 25-30.  As we explained, none of these statements constitutes evidence that Trust

Title's breaches of its contracts were excusable.  Gov't Br. at 48-49.  Glaringly absent from the transcript of this lengthy call is any discussion about the excuses cited in Trust Title's post-trial brief, such as: receipt of contract packages and orders from HMBI; receipt of earnest money deposits; the speed at which HMBI assigned closings to Trust Title; receipt of "stale cases" from HMBI; buyers' frustration due to the date when HMBI signed contracts; or when it was appropriate to cancel closings.  *Compare* Pl. Br. at 25-30 *with, e.g.,* Pl. Br. at 8, 13-16, 19, 23, 38, 60, 65.  If any of these issues had been as important as Trust Title now contends, it would have raised them during this call and to the contracting officer.

5.   <u>Default Termination Procedures</u>

Although Trust Title claims that the contracting officer made "numerous errors in the actual default termination process," there is no evidence to support this claim and, as explained in Section III, *infra*, the contracting officer correctly followed the necessary protocols.  And although Trust Title makes the specious claim that "erroneous data" was used in issuing the termination notice, it cites no relevant evidence to confirm that assertion.  Certainly, Trust Title has not set forth evidence that its wire transfers were, in fact, made within one day after the closings occurred or that its performance had improved since the issuance of the cure notice and show cause letter.

II.   <u>The Government Is Entitled To Reprocurement Costs</u>

As an initial matter, we observed in our opening brief that Trust Title had not presented any evidence at trial that contradicted HUD's determination that Trust Title had wired the proceeds of many transactions to HUD later than the next business day and that HUD, therefore, is entitled to $14,007.65 in liquidated damages.  Trust Title has not challenged this conclusion in its brief.  Thus, the Court should award HUD liquidated damages in this amount.

In our opening brief, we demonstrated that HUD quickly reprocured the work and awarded contracts with performance work statements that were identical to the Trust Title contracts.  Tr. 932/11-19.  The Government balanced its pressing need for contractors to perform closings with its duty to minimize excess costs by sending the solicitation to eight contractors. Tr. 928/12–929/19.

Despite indicating that it has no intent or ability to pay a judgment if the Court awards the Government reprocurement costs, Trust Title objects to the award of these costs.  It contends that the Government should have awarded the reprocurement work to O'Brien and, had it done so, there would have been minimal excess costs because O'Brien's price was similar to Trust Title's. Pl. Br. at 54.  We addressed this in our opening brief.  The contracting officer awarded one of the replacement contracts to O'Brien but it then backed out, refusing to perform the work.  Tr. 930/18–931/15.  In any event, Dale Fussell, not O'Brien, had the lowest prices.  Tr. 931/19-22.

Trust Title next contends that HUD would not have incurred any costs if it had used a buyer select program.  Pl. Br. at 54-55.  While HUD used a buyer select program immediately after terminating Trust Title, HUD paid up to $400 per closing during this period.  Tr. 129/1-15. Because this was up to $176 more per closing than HUD paid Trust Title, we do not understand why Trust Title contends this program would have eliminated reprocurement costs.

Trust Title further contends that the reprocurement contracts are "grossly dissimilar" to its own contracts.  However, it does not dispute that the work called for is the same and that nearly all terms and conditions of the contracts are the same or similar.  There is no question that the reprocurement contracts required the disbursement of sales proceeds to the Government by 2:00 p.m. the next business day after closing.  Trust Title contends that the contracts were dissimilar because the reprocurement contracts were indefinite delivery/indefinite quantity rather

than requirements contracts and the estimated quantities were lower.  However, Trust Title has not demonstrated that these distinctions made any difference in the price.  Indeed, the lowest prices came from Dale Fussell.  DX 101, 102.  He testified that he formulated his price based, in part, on his observation that Trust Title did not have enough people to perform the work.  Tr. 553/13-20.  There is no evidence or suggestion in the record that Mr. Fussell charged a higher price due to the type of contract or the lower quantities.

Trust Title also contends that the approximately three-month interval between the termination of Trust Title and the execution of the reprocurement contracts also increased costs, but cites no support for this contention.  Trust Title fails to show how HUD could have awarded the reprocurement contracts more quickly while still allowing for a measure of competition.

Finally, Trust Title contends that the Government in its brief has not provided sufficient breakdown of closing costs paid to the reprocurement contractors that the Government is seeking in its claims.  The amounts paid to these contractors are contained in DX 91-96.  For example, DX 91 indicates that Dale Fussell closed a total of 910 transactions in eastern North Carolina during the period February 14, 2011 to February 27, 2012.  At $375 per transaction, HUD paid Mr. Fussell a total of $340,850.  DX 91 at 30.  If Trust Title had performed this work, HUD would have paid Trust Title $203,840 (910 x $224).  HUD seeks the difference in these amounts, which is $137,010 ($340,850 - $203,840).  For all reprocurement contractors, the excess costs total $758,221.

The amount that HUD seeks includes closings assigned after the end of the base year of Trust Title's contract because HUD could have exercised an option with Trust Title.  In the event that the Court determines that HUD is entitled only to the excess costs for cases assigned through June 30, 2011, the end of Trust Title's base contract period, and measures the excess costs using

- 35 -

the reprocurement contractor's lowest CLIN value, the Government is entitled to recover

$335,322 in excess reprocurement costs, as detailed below:

| DX | Reprocurement Contractor | Cases Assigned Through 6/30/11 | Contractor's Lowest CLIN | Trust Title Price | Difference |
|----|--------------------------|-------------------------------|--------------------------|-------------------|------------|
| DX91 | D. Fussell (East) | 397 | $375 | $224 | $59,947 |
| DX92 | D. Fussell (West) | 433 | $350 | $224 | $54,558 |
| DX93 | JE Thornton (West) | 201 | $400 | $224 | $35,376 |
| DX94 | JE Thornton (East) | 146 | $500 | $224 | $40,296 |
| DX95 | Donato & Grewal | 385 | $450 | $224 | $87,010 |
| DX96 | P. Chastain | 385 | $375 | $224 | $58,135 |

III.    <u>The Cases Trust Title Cites Do Not Support Its Contentions</u>

Trust Title briefly discusses three cases at the end of its brief that it contends are

supportive of its claim that the default termination was unlawful.  As we explain below, these

cases are either dissimilar to the facts of this case or are otherwise inapplicable to Trust Title.

Trust Title contends that *Darwin Construction Co., Inc. v. United States*, 811 F.2d 593,

596 (Fed. Cir. 1987), requires the conversion of the termination for default to one of

convenience.  Pl. Br. at 43, 75.  In *Darwin*, the contractor failed to complete the work on time

but the Government suffered no ill effects of that failure.  The Court of Claims explained in

*Darwin* that a default termination may be converted into one for convenience if the contracting

officer does not use his discretion to make an independent judgment as to the merits of the case.

Because the contracting officer had mechanically enforced the default clause without using his

own judgment, the Court of Claims held that this was an abuse of discretion.  *Id.* at 595-96.

In *McDonnell Douglas Corp. v. United States,* 182 F.3d 1319 (Fed. Cir. 1999), the Court

of Appeals clarified that *Darwin* stands for the limited proposition that "When there is no nexus

between the decision to terminate for default and contract performance, the termination for

default may be arbitrary and capricious."  *Id.* at 1326.  The Court of Appeals held that when the

"termination for default was predicated on contract-related issues, it was within the discretion of the government." *Id.* at 1321.

In this case, the contracting officer's default termination decision was entirely related to Trust Title's contract performance. Ms. Barbee gave Trust Title every chance to improve its performance, sending both a cure notice and a show cause notice to Trust Title before termination. DX 50, 55. Ms. Barbee also offered to terminate the contracts for convenience but Trust Title refused. Tr. 916/16-17. She held a meeting with Trust Title on October 27, 2010, and instructed Trust Title to wire missing funds to HUD by October 29, but it failed to do so. Tr. 917/7-12. Ms. Barbee carefully considered the decision to terminate the contracts for default and consulted with counsel. Tr. 925/7-14. In considering the likelihood that Trust Title could perform, Ms. Barbee weighed Mr. Gardner's statement that he considered the performance work statements to be defective, which led her to conclude that Trust Title could not. Tr. 925/20–926/1. Ms. Barbee was also aware that Trust Title was not paying its employees. Tr. 912/19-25. Accordingly, Ms. Barbee testified that she had considered all facts and circumstances presented to her, and considered any reasonable alternatives. Tr. 926/23–927/2. Given the circumstances presented, she made a rational, independent decision that default terminations were warranted.

Trust Title next contends that *Helene Curtis Industries, Inc., v. United States*, 312 F.2d 774 (Ct. Cl. 1963), should cause the default termination to be set aside because HUD did not tell offerors about the Lakeside novation. *Helene Curtis* is a superior knowledge case. Under the doctrine of superior knowledge, the Government can be held liable if the Court concludes that the agency should have disclosed information on prior delays, costs, and risks of performance. The doctrine of superior knowledge is generally applied to situations where (1) a contractor undertakes to perform without vital knowledge of a fact that affects performance costs or

duration, (2) the Government was aware the contractor had no knowledge of and had no reason to obtain such information, (3) any contract specification supplied misled the contractor, or did not put it on notice to inquire, and (4) the Government failed to provide the relevant information. *Am. Ship Bldg. Co. v. United States*, 654 F.2d 75, 79 (Ct. Cl. 1981) (citing *Helene Curtis*).

Trust Title cannot meet any of the first three elements of this test. As we established above, both a Trust Title vice president and a practicing North Carolina attorney told Kip Gardner before it entered into the HUD contracts that title companies faced difficulties in North Carolina, an attorney state. DX 8, 9, 234. Moreover, Kip Gardner knew that Trust Title would have to perform closings under the supervision of an attorney and that the state bar was hostile to the participation of title companies. Tr. 222/11–223/16. The contracts did not mislead Trust Title into believing that it would be easy for a title company to perform in North Carolina; they specifically told offerors that they would be responsible for obtaining necessary licenses and complying with state laws. DX 15 at 7. Where a contractor is generally aware of the problems that may be encountered, the Government may not be held liable under the superior knowledge doctrine. *Grumman Aerospace Corp. v. United States*, 497 F.3d 1350, 1357-58 (Fed. Cir. 2007).

Finally, Trust Title also cites *L.W. Foster Sportswear Co., Inc. v. United States*, 405 F.2d 1285 (Ct. Cl. 1969), in support of its claim that the Government purportedly failed to give notice that it would enforce the contract more strictly than it did with Lakeside/O'Brien. This contention fails for several reasons. In *L.W. Foster*, the contractor had previously performed five or six contracts with the agency and had assumed that the contract would continue to be enforced in the same manner but the agency changed its enforcement on the contract at issue. *Id.* at 1290-91. To the extent that this case is even applicable given that Trust Title had not performed any prior contracts for HUD, Trust Title has not demonstrated that it relied upon any particular

Government practice during the O'Brien contract when it formulated its CLIN prices.  Kip Gardner admitted that he had no knowledge regarding the performance of the O'Brien contract. Tr. 1261/23–1262/1.  Moreover, Trust Title does not specify what enforcement procedures it is talking about.  As we established above, the limited number of documents in the record relating to the O'Brien contract show that HUD demanded compliance from O'Brien and O'Brien complied.  While a document indicates that O'Brien, like Trust Title, had some difficulties at the beginning of the contract term, O'Brien was able to improve its performance because, among other things, its employees did not walk out.  By contrast, Trust Title's performance deteriorated after its employees and vendors withheld their services due to non-payment.  Accordingly, *L.W. Foster* does not help Trust Title.

IV.     The Court Should Disregard Exhibits Cited In Trust Title's Brief But Not Admitted

        At pages 77 to 81 of its brief, Trust Title contends that the Court should reconsider its ruling barring the entry of certain proposed exhibits into evidence.  Unfortunately, Trust Title does not identify the documents by exhibit numbers and it is unclear as to which exhibits it is referring.  At trial, Trust Title went so far as to contend that documents created by the O'Brien Law Firm are admissions of a party opponent but the Court correctly rejected that because O'Brien is not a party and does not have any direct relationship to this case.  Tr. 1276/12-20. Accordingly, Trust Title has not identified any particular ruling by the Court that was in error and the Court should not revisit its rulings.

        The following plaintiff exhibits cited in Trust Title's brief were not admitted into evidence: 5, 12, 28, 39, 52, 198, 226, 253, 261, 338, 353, 373 (demonstrative only), 412, 434, 439 (demonstrative only), 442 (demonstrative only), 443 (demonstrative only), 445, 448 (demonstrative only).  We request that the Court decline to consider these exhibits.

<u>CONCLUSION</u>

As we stated in our opening brief, Trust Title's defaults were the product of multiple, ill-informed business decisions made by Trust Title and Trust Title must live with the consequences of those decisions.  For this reason and the reasons set forth above, we respectfully request that the Court rule that the contracting officer acted within her discretion in terminating the contracts for default and enter judgment in favor of the Government on Trust Title's complaint.  Further, we respectfully request that the Court grant the Government judgment on its counterclaim in the amount of $758,221 for excess reprocurement costs and $14,007.65 in liquidated damages.

Respectfully submitted,

STUART F. DELERY
Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

s/Bryant G. Snee
BRYANT G. SNEE
Deputy Director

OF COUNSEL:

MICHAEL N. O'CONNELL
Senior Trial Counsel

TODD P. MAIBERGER
U.S. Department of Housing
and Urban Development
Office of General Counsel
451 7th Street, S.W.
Washington, DC 20410

s/Eric E. Laufgraben
ERIC E. LAUFGRABEN
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Telephone: (202) 353-7995
Facsimile:  (202) 514-8624

June 4, 2014

Attorneys for Defendant